**Todd ISETON, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 2–883A295.

Court of Appeals of Indiana, Second District.

Dec. 27, 1984.

Bruce M. Frey, Marion, for appellant.

Linley E. Pearson, Atty. Gen., Kathleen Ransom Radford, Deputy Atty. Gen., Indianapolis, for appellee.

SHIELDS, Judge.

Defendant Todd Iseton appeals his conviction in a jury trial of two counts of theft, class D felonies under Ind.Code § 35–43–4–2(a) (1982).[1] He raises the following issues on appeal:

---

1. Ind.Code § 35–43–4–2(a) (1982) provides as follows:

1) Whether the evidence presented at trial was sufficient to support the conviction,

2) whether it was error to admit into evidence the deposition of the victim, Miss Geneva Haines, and

3) whether it was error to overrule Iseton's objection to trial before a six-person jury.

### Facts

In July of 1980, Miss Geneva Haines lived alone in a house owned by her niece and close companion, Velma Thresher. Because Miss Haines, then in her mid-seventies, was a financially conservative person, Mrs. Thresher was shocked when Miss Haines asked her for money. Miss Haines's bank checked its records, at Mrs. Thresher's request, and then contacted the Grant County Sheriff's department.

Upon investigation, Lieutenant Brown concluded sums of money had been taken from Miss Haines for repairs to her home that were not made. Because the person who purportedly made the repairs would call to arrange cash payments for the unmade repairs, Brown installed an electronic recording device on Miss Haines's telephone.

Using information from the recordings to time his observations, Brown watched Miss Haines pay a man, later identified as Iseton's son, in marked bills on July 2, 1980. On July 21, Iseton was arrested in Miss Haines's home; at the time of the arrest, Iseton was carrying $1,800.00 in marked bills from the July 2 payment and $280.00 Miss Haines had given him that day.

On July 28, 1980, Iseton was charged by information with two counts of theft involving the July 2 and July 21 payments.

"A person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a class D felony."

Ind.Code § 35–43–4–1(b)(4) and (6) (1982) provide as follows:

"Under this chapter, a person's control over property of another person is 'unauthorized' if it is exerted:

The case was tried October 21, 1982; Iseton voluntarily waived his right to be present at trial. Iseton's motions to suppress the deposition of Miss Haines were overruled, and the case was tried to a six-person jury over Iseton's objection that a twelve-person jury was constitutionally required.

### I. Sufficiency of the Evidence

Iseton argues the evidence was insufficient to support his convictions. As to Counts I and II, he argues that after he voluntarily absented himself from the trial, the State failed to identify him (Iseton) as the person who committed the crimes. He also argues that the State failed to establish proper venue. As to Count II Iseton argues the State failed to prove any criminal conduct by him.

In reviewing the sufficiency of the evidence, we neither weigh the evidence nor judge the credibility of witnesses. If there is substantial evidence of probative value to support the conclusion of guilt beyond a reasonable doubt, the verdict will not be set aside. *Coburn v. State*, 461 N.E.2d 1154 (Ind.App.1984); *Gatewood v. State*, 430 N.E.2d 781 (Ind.1982).

### A. Identity of the Perpetrator

A defendant can expressly waive his right to be present at trial, *Gilbert v. State*, 395 N.E.2d 429 (Ind.App.1979), and the trial may continue in his absence. *Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973).

Even when a defendant is present at trial, witnesses need not point to the defendant to establish the requisite identification. *State v. Schroeppel*, 240 Ind. 185, 162 N.E.2d 683 (1959) (witness referred to

. . . . .

by creating or confirming a false impression in the other person; [or]

. . . . .

by promising performance that the person knows will not be performed."

both "Schroeppel" and "defendant" and said that the defendant was present in the courtroom); *O'Brien v. State*, 422 N.E.2d 1266 (Ind.App.1981) (testimony showed defendant had identified himself by name to arresting officer); *Preston v. State*, 259 Ind. 353, 287 N.E.2d 347 (1972) (three witnesses referred to "defendant" as the person who committed the crime). Identification by name, for example, is sufficient. *Broecker v. State*, 168 Ind.App. 231, 342 N.E.2d 886, 890 (1976). *See also Martin v. State*, 457 N.E.2d 1085 (Ind.1984) (sufficient identification, in defendant's absence, in witnesses' references to defendant's name and to the "person who had been sitting at the defendant's table during voir dire" of the jury); *Bullock v. State*, 451 N.E.2d 646 (Ind.1983) (identification primarily by photographs, in defendant's absence).

While no witness pointed to Iseton and expressly identified him as the transgressor, known by Miss Haines as Mr. Dorman, there was sufficient evidence presented at trial from which the fact finder could determine Iseton's identity beyond a reasonable doubt.

The deposition of Miss Haines included the following testimony:

"Q. Did they arrest Todd Iseton?

A. Yes, 'cause I told who he was. I identified him.

. . . .

Q. And that was the same man that you had been giving money to for all this time?

A. Yes. They'd been looking for him for a good while."

Record at 388–89. Lieutenant Brown, the officer who arrested the man present at the July 21 incident, referred to the person arrested as "the defendant"; Brown noted that when that person was arrested, "[h]e had identification on him to state that he was Todd Iseton." Record at 342. Anoth-

er officer testified that shortly after the arrest Miss Haines identified the defendant, Todd Iseton, as the "Mr. Dorman," who had been there on previous occasions. Record at 353.

The evidence on the record is sufficient to support Iseton's identification beyond a reasonable doubt.

**B. Sufficiency of Evidence Regarding July 2nd Theft**

Iseton claims the State failed to prove he was involved with the July 2nd theft. He admits he was in possession of $1,800 in marked bills that were part of that theft but argues their possession alone was insufficient to support his conviction of Count II under the information.[2] The evidence shows his son received the July 2nd payment from Geneva Haines.

Under Ind.Code § 35–41–2–4 (1982), a person who knowingly or intentionally induces or causes another person to commit an offense commits that same offense. This section effectively codifies the common law doctrine that a person who causes a crime to be committed by an agent is responsible for the acts done by the agent. *See* Ind.Code Ann. § 35–41–2–4 commentary by C. Thompson (West 1978).

The record shows that before the July 2nd payment Miss Haines received a telephone call from Iseton arranging that payment. After the July 2nd payment Miss Haines received a phone call from "those [whom the police] were investigating" (the "Mr. Dorman" Miss Haines later identified as Iseton) indicating that the amount picked up was not enough and that another payment would be necessary. The additional payment was set for July 21; Iseton was arrested in Miss Haines's house when he arrived to take payment on that date. Record at 342.

The evidence presented at trial was sufficient to support a finding Iseton at

---

**2.** Under Count II, Iseton was charged with having, "on or about the 2nd day of July, A.D. 1980 at and in the County of Grant, and State of Indiana, ... unlawfully and knowingly [exerted] unauthorized control over property of Gene-

va Haines, to wit: United States currency ... by creating or confirming a false impression ... with intent to deprive Geneva Haines with the value thereof." Record at 12.

least caused his son to take the payment of money prearranged in Iseton's earlier phone conversation with Miss Haines. Accordingly, Iseton is criminally responsible for the theft of July 2nd.

### C. Grant County Venue

Iseton argues the State failed to introduce evidence that the crimes charged were committed in Grant County, where the trial was held. We disagree. The following exchange occurred at Miss Haines's deposition.

"Q. You don't recall the address. Where did you live from Marion, can you describe where your home was in relationship to the city of Marion?

A. Seven (7) miles east of Marion on State Road $ 18.

Q. Okay, thank you. And why did you leave your Marion, Grant County address?

A. My health.

Q. And do you know, recall when approximately you left that Grant County address?

A. Two (2) or three (3) months ago.

Q. And where did you go from your Grant County home?

A. First I went to my niece's in Muncie and then I came here. I been here two (2) or three (3) months."

Record at 368.

Considered along with other testimony regarding the events of July, 1980, including the investigation, surveillance and arrest by Grant County Sheriff personnel, the testimony shown above was sufficient for a reasonable fact finder to conclude, by a preponderance of the evidence, that the crimes were committed in Grant County.

### II. *Admission of the Deposition*

Iseton argues the court erred in denying his motion to suppress the deposition of Geneva Haines. He claims the State failed to establish the witness was unavailable and he was therefore denied the right to confront the witnesses against him.[3]

The purposes of the confrontation requirement are to insure reliability by means of the oath, to expose the witness to the probe of cross-examination, and to permit the trier of fact to weigh the demeanor of the witness. *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). While the right of confrontation is not absolute, the difficulty lies in determining when considerations of public policy and the necessities of the case justify dispensing with confrontation at trial. *United States v. Wolff*, 658 F.2d 455 (7th Cir. 1981) (quoting *Mattox v. United States*, 156 U.S. 237, 243, 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895)).

The two-step approach used in determining when previously recorded testimony may be used in a trial in lieu of in-court testimony was described by the Seventh Circuit Court of Appeals in its opinion in *United States v. Wolff. See also Gallagher v. State*, 466 N.E.2d 1382 (Ind.App.1984). The first part of the test requires the prosecution to "either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant." 658 F.2d at 460 (quoting *Ohio v. Roberts*, 448 U.S. 56, 65, 100 S.Ct. 2531, 2538, 65 L.Ed.2d 597 (1980)).

---

**3.** U.S. Const.amend. 6 states that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...."

Ind. Const. art. 1 § 13 provides that, "[i]n all criminal prosecutions, the accused shall have the right ... to meet the witnesses face to face, and to have compulsory process for obtaining witnesses in his favor."

Iseton does not argue and we do not reach the closely related issues under the hearsay restrictions. "While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law." *California v. Greene*, 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970).

The court must then determine that the statement to be used bears sufficient "indicia of reliability," usually by establishing the defendant had an opportunity to cross-examine the witness.

"[T]he right to use a deposition at trial in place of the personal appearance of the deponent is usually conditioned upon his unavailability. The matter is largely governed by statute or rule, and those in force locally should be consulted." D. McCormick, *McCormick on Evidence*, § 253 p. 613 (E. Cleary 2nd ed. 1972). In Indiana "unavailability" is defined in Ind.Rules of Procedure, Trial Rule 32(A)(3): "The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds ... (c) that the witness is unable to attend or testify because of *age, sickness, infirmity,* or imprisonment; ...." [4] (Emphasis added.)

■ The admission of depositions under T.R. 32(A)(3) is within a trial court's discretion, and its ruling on such a request cannot be reversed except upon a showing of an abuse of its discretion. *Jarvis v. State,* 441 N.E.2d 1 (Ind.1982); *Thomas v. State,* 423 N.E.2d 682 (Ind.App.1981).

■ A finding of unavailability can be implicit in the trial court's admission of the deposition, and the burden is on the appellant to prove that the error of judgment was clearly against logic and the natural inferences to be drawn from the record. *Wells v. Gibson Coal Company,* 170 Ind. App. 445, 352 N.E.2d 838 (1976); *Schoeff v. McIntire,* 153 Ind.App. 289, 287 N.E.2d 369 (1972).

In *Schoeff v. McIntire,* 153 Ind.App. 289, 287 N.E.2d 369 (1972), the court found unavailability sufficiently established by a doctor's testimony he felt testifying would affect the health of the deponent. In *Wells v. Gibson Coal Company,* 170 Ind.App. 445, 352 N.E.2d 838 (1976), the court found sufficient evidence of unavailability in the deponent's references in the deposition to his "physical complaints". *See also Cooper v. Indiana Gas and Water Co.,* 173 Ind.App. 47, 362 N.E.2d 191 (1977) (three witnesses were unavailable; no business replacement, no babysitter, and out of state on vacation were the sufficient reasons); *Drummond v. State,* 467 N.E.2d 742 (Ind. 1984) (refusal to testify made witness unavailable). The opinions in *Schoeff* and *Wells* provide support for the trial court's admission of the depositions.

In the instant case, Velma Thresher testified before the deposition was offered into evidence that Miss Haines, seventy-nine years old at the time of trial, had surgery on her hands two months after the arrests and that her health had deteriorated in the two years preceding the trial. She was living in a nursing home at the recommendation of her doctor. Mrs. Thresher's testimony included the following statements:

"A. [Geneva Haines] returned to the hospital in November of 1981, and this was for low blood, anemic condition. And then when we—the [civil] trial was held last spring she was very ill, and has improved, but not to the point of being able to testify.

. . . .

**4.** At the time the crimes were committed in 1980, the law regarding the use of depositions in a criminal case was governed by T.R. 32 and the Indiana Supreme Court decisions in *Carrol v. State,* 263 Ind. 696, 338 N.E.2d 264 (1975) and *Murphy v. State,* 265 Ind. 116, 352 N.E.2d 479 (1976).

Now, Ind.Code Ann. § 35–37–4–3 (Burns Supp.1984) provides as follows: "The state and defendant may take and use depositions of witnesses in accordance with the Indiana Rules of Trial Procedure."

Several writers have argued that because of confrontation clause rights, the standards for determining unavailability should be higher for criminal trials than for civil trials. *See* Annot., 44 A.L.R.2d 768 (1955); D. McCormick, *supra;* D. Johnson, The Hearsay Rule and Its Exceptions, in *Handbook in Indiana Evidence,* 137 (1961). However, Johnson concluded that in Indiana the requirements of unavailability are less demanding for depositions than for former testimony, *Handbook, supra* at 137, and this court and the supreme court have relied upon civil decisions in determining the proper application of T.R. 32 to criminal appeals. *See Drummond v. State,* 467 N.E.2d 742 (Ind.1984); *Thomas v. State,* 423 N.E.2d 682 (Ind.App.1981).

A. She has deterioration of the bones, and arthritis, and then this nervous condition in her hands.

. . . .

Q. In your opinion then, it would be detrimental to her health to appear to testify?

A. Yes, I think it would be.

Record at 304–305.

■ We find the trial court could reasonably have concluded that Miss Haines was "unable to attend or testify because of age, sickness," or infirmity; therefore it did not abuse its discretion in admitting the deposition.

■ Iseton further attempts in his brief to make an argument regarding Miss Haines's testimony about incidents other than the crimes charged. However, he has waived any such argument by failing to include it in his motion to correct error. *See generally, Thomas v. State,* 428 N.E.2d 231 (Ind.1981).

### III. *Constitutionality of the Six Person Jury*

During the two years between the time Iseton committed the offenses, July 1980, and the time of his trial, October 1982, the laws in Indiana controlling the number of persons required to constitute a jury changed. In 1980 the law provided for a twelve-person jury in superior court criminal trials,[5] but as of September 1, 1981, the law provided for a six-person jury in all class D felonies, wherever tried.[6] We review the issue of whether the application of the latter provision violated the constitutional protections against ex post facto laws.[7]

■ The primary purpose of the constitutional prohibition against ex post facto laws is the assurance that legislative acts will give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.

"[O]ur decisions prescribe that two critical elements must be present for a criminal or penal law to be *ex post facto:* it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it.

. . . .

We have also held that no *ex post facto* violation occurs if the change effected is merely procedural, and does 'not increase the punishment nor change the ingredients of the offense or the ultimate facts necessary to establish guilt.'

Alteration of a substantial right, however, is not merely procedural, even if the statute takes a seemingly procedural form."

*Weaver v. Graham,* 450 U.S. 24, 29–30 and n. 12, 101 S.Ct. 960, 964 and n. 12, 67 L.Ed.2d 17 (1981) (quoting *Hopt v. Utah,* 110 U.S. 574, 590, 4 S.Ct. 202, 210, 28 L.Ed.

---

**5.** Ind.Code Ann. § 35–1–30–1 (Burns 1979) provided as follows:

"The trial jury used in civil cases shall act also in criminal cases, but must in criminal cases consist of twelve (12) qualified jurors [except for an inapplicable provision concerning jury trials in the county courts, Ind.Code Ann. § 33–1–.5–7–6]."

**6.** Ind.Code § 35–1–30–1 was amended by Acts 1981, P.L. 281 § 3, effective September 1, 1981, to provide as follows:

"The trial jury used in civil cases shall act also in criminal cases, but must in criminal cases, consist of:

(1) twelve (12) qualified jurors in a felony case other than a Class D felony case; or

(2) six (6) qualified jurors in a Class D felony, misdemeanor, infraction or ordinance violation case."

The amended version was repealed by Acts 1981, P.L. 298 § 9, effective September 1, 1982.

If the 1981 amendment to I.C. 35–1–30–1, which did not contain a savings clause, does not violate the prohibition again ex post facto legislation, the savings clause in Acts 1981, P.L. 298 § 9, which repealed I.C. 35–1–30–1 effective September 1, 1982, had no practical effect, because the numerical composition of a jury in class D felonies remained unchanged.

**7.** U.S. Const. art. 1 § 10, cl. 1 provides that, "[n]o state shall ... pass any bill of attainer, ex post facto law, or law impairing the obligation of contracts...."

Ind. Const. art. 1 § 24 provides that, "[n]o ex post facto law, or law impairing the obligation of contracts, shall ever be passed."

262 (1884) (footnotes and citations omitted)). *See United States ex rel. Massarella v. Elrod,* 682 F.2d 688 (7th Cir.1982); *Warner v. State,* 265 Ind. 262, 354 N.E.2d 178 (1976). The trial court's application of the 1981 amendment to Ind.Code § 35–1–30–1 (providing for a six-person jury) was unquestionably retrospective in effect. However, we conclude that no violation of the ex post facto guarantees occurred, because no substantial right was affected. Though our holding rests on the determination that no substantial right was affected, we also find that the application of the amendment did not disadvantage Iseton.[8]

### A. Substantial Right

■ Two decisions, *Thompson v. Utah,* 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061 (1898) and *McSears v. State,* 247 Ga. 48, 273 S.E.2d 847 (1981), appear to support the positions that Iseton had a substantial right to the jury size required when the offenses were committed[9] and that he was disadvantaged by the change. However, *Thompson* has been effectively overruled, and we find *McSears* unconvincing.

The *Thompson* case involved the change in law that occurred when Utah became a state. The territorial statutes in force when Thompson committed the offense provided for a twelve-person jury, and in the initial prosecution the jury was composed of twelve members. Thompson successfully appealed his conviction, but before the second trial was held, Utah was admitted to the union. In the second trial, Thompson faced a jury of eight, as required by the new state constitution. The *Thompson* Court held that the defendant had acquired the right to be tried by a jury of twelve and that the conviction must be reversed because of the ex post facto clause violation.

"In our opinion, the provision in the constitution of Utah providing for the trial in courts of general jurisdiction of criminal cases, not capital, by a jury composed of eight persons, is ex post facto in its application to felonies committed before the territory became a state, because, in respect of such crimes, the constitution of the United States gave the accused, at the time of the commission of his offense, the right to be tried by a jury of twelve persons, and made it impossible to deprive him of his liberty except by the unanimous verdict of such a jury."

170 U.S. at 355, 18 S.Ct. at 624.

However, in *Williams v. Florida,* 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), the Supreme Court concluded that "the fact that the jury of common law was composed of precisely 12 is a historical accident, unnecessary to effect the purposes of the jury system and wholly without significance 'except to mystics.'" 399 U.S. at 103, 90 S.Ct. at 1907 (citations omitted). The Court described the *Thompson*

---

**8.** In determining that the number of persons comprising a jury is not a substantial right, we do not reach the question of whether that numerical concern is substantive or procedural. *See Austin v. State,* 468 N.E.2d 1027 (Ind.1984) (noting that a statute procedural in nature can adversely affect substantive rights). The matter, however, seems well settled as a procedural concern.

"This court has previously stated that, in general terms, substantive law is that which creates duties, rights, and obligations, while procedural law prescribes the methods of the enforcement of those rights.

... [The rule of procedure which reduced the jury size for trials of certain offenses] in no way attempts to alter a defendant's substantive constitutional right to a trial by jury.... It is properly characterized as procedural in nature."

*State ex rel. City of Columbus v. Boyland,* 58 Ohio St.2d 490, 391 N.E.2d 324, 326 (1979) (footnotes and citations omitted).

And Professor Tribe referred to a retrospective-change-in-jury size case as a procedural matter, but noted that rather than focusing on substance versus procedure, the court should "focus on the danger that those enacting the new procedures did so with knowledge of whom they would adversely affect and how." L. Tribe, *American Constitutional Law,* 483–84 (1978).

**9.** So far as determining whether a law is ex post facto, the time of enactment and the time of the commission of the offense are the relevant concerns. *Warner v. State,* 265 Ind. 262, 354 N.E.2d 178 (1976).

opinion as based on unsupported assumptions, and held that Congress and the various state legislators should determine the number that can constitute a jury unrestrained by an interpretation of the sixth amendment. Further, the Court went on to clearly express the view that neither theory nor experience supports the position that an accused has any advantage with a twelve-person jury. 399 U.S. at 102–103, 90 S.Ct. at 1907.

Following the *Williams* decision, two other state courts reached the decision we reach today. In *State v. Maresca*, 173 Conn. 450, 377 A.2d 1330 (Conn.1977) and *State v. McIntosh*, 23 Ariz.App. 246, 532 P.2d 188 (1975) the trial courts applied current six and eight-person jury statutes rather than statutory provisions for larger juries applicable when the offenses were committed. The reviewing courts were in agreement that violations of the ex post facto restrictions had not occurred.

The Supreme Court of Connecticut summarized its opinion succinctly:

> "Since the *Williams* decision, a jury of twelve is no longer considered a constitutional right, and as a matter of law, it is not deemed to offer any advantage to the defendant. Nor can it be any longer considered substantial. Thus the statute which diminished the jury's size from twelve to six did not take away a substantial right, but operated only in a limited and unsubstantial manner to ... [the defendant's] disadvantage. *Beazell v. Ohio*, [269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925)]. It is noteworthy that the Arizona Court of Appeals, when faced with this same question, reached this same conclusion. *State v. McIntosh*, 23 Ariz.App. 246, 532 P.2d 188."

377 A.2d at 1333.

The Georgia Supreme Court reached a contrary result in *McSears v. State*, 247 Ga. 48, 273 S.E.2d 847 (1981). However, we find its opinion unconvincing because it misconstrues the United States Supreme Court decision in *Ballew v. Georgia*, 435 U.S. 223, 98 S.Ct. 1029, 55 L.Ed.2d 234 (1978).

The *McSears* court stated that, "while *Williams v. Florida* may have indicated that trial by a jury of 12 was not a 'substantial right,' the more recent *Ballew v. Georgia* suggests that it is." 273 S.E.2d at 850. We disagree. The *Ballew* decision did not alter any of the principles applicable to juries of six or more persons as described in the *Williams* opinion.

The *Ballew* holding was narrow and precise. After an extensive review of the research findings regarding jury size and effectiveness, the Court summarized its position:

> "While we adhere to, and reaffirm our holding in *Williams v. Florida*, these studies, most of which have been made since *Williams* was decided in 1970, lead us to conclude that the purpose and functioning of the jury in a criminal trial is seriously impaired, and to a constitutional degree, by a reduction in size *to below six members*."

435 U.S. at 240, 98 S.Ct. at 1039 (emphasis added).

Finally, the twelve-member jury is not an indispensible component of the Indiana Constitution. *O'Brien v. State*, 422 N.E.2d 1266 (Ind.App.1981).

> "While a felony defendant has a constitutional right to a jury trial, nothing in the federal or Indiana constitutions guarantees him a specific number of jurors. There is, in effect, no constitutional difference between a six-member jury and a twelve-member jury so long as each provides the requisite safeguard against overzealous prosecutors and eccentric judges."

422 N.E.2d at 1270.

We hold a defendant does not have a substantial right to a jury composed of any specific number, so long as the number is not less than six. *See generally, Ballew*, 435 U.S. at 240, 98 S.Ct. at 1039.

### B. Disadvantage

It is axiomatic that to determine if a new law may be fairly characterized as more onerous, we must compare the two statuto-

ry procedures. *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977); *Crowell v. United States Parole Commission*, 724 F.2d 1406 (3rd Cir.1984). While Iseton may argue that a twelve-person jury is more likely to return a result favorable to a defendant than a six-person jury, the courts of Indiana and the Federal system have expressly rejected that hypothesis. *O'Brien v. State*, 422 N.E.2d 1266 (Ind.App.1981); *Judy v. State*, 470 N.E.2d 380 (Ind.App.1984). The *Williams* Court showed the flaw in the logic of such an hypothesis:

> "It might be suggested that the 12-man jury gives a defendant a greater advantage since he has more chances of finding a juror who will insist on acquittal and thus prevent conviction. But the advantage might just as easily belong to the State, which also needs only one juror out of twelve insisting on guilt to prevent acquittal.... In short, neither currently available evidence nor theory suggests that the 12-man jury is necessarily more advantageous to the defendant than a jury composed of fewer members."

399 U.S. at 102, 90 S.Ct. at 1907 (footnotes omitted).

Because the 1981 amendment to Ind. Code § 35-1-30-1 did not affect a substantial right, the application of that amendment was not in violation of the ex post facto clauses. We also find that the application did not disadvantage Iseton.

Judgment affirmed.

BUCHANAN, C.J., concurs.

SULLIVAN, J., concurs with separate opinion.

SULLIVAN, Judge, concurring.

I concur in the affirmance of this conviction. I disagree, however, with the majority's conclusion that application of the six-person jury amendment to I.C. 35-1-30-1 "was unquestionably retrospective in effect." (Slip Opinion, page 15)

The amendment took effect after commission of the crime charged but did not affect the elements of that crime or the punishment attributable to the crime. The amendment took effect prior to the commencement of the trial. As of the date of the amendment it was entitled to prospective application to all trials commencing thereafter. In this regard, our case differs from *Warner v. State* (1976) 265 Ind. 262, 354 N.E.2d 178. That case involved a detrimental change in the permissible punishment for the crime committed. The "triggering event", as alluded to in that case, was quite obviously the commission of the crime. It is the trial, in the case before us, which is the crucial event. *See Weaver v. Graham* (1981) 450 U.S. 24 at 29–30, 101 S.Ct. 960 at 964.

In light of the overruling of *Thompson v. Utah* (1898) 170 U.S. 343, 18 S.Ct. 620, 42 L.Ed. 1061, I do not believe that there are any *ex post facto* connotations in this case whatever.